IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

LISA K. PAZOUR,

                Plaintiff,                  OPINION AND ORDER

    v.

                                                    16-cv-020-wmc

NANCY A. BERRYHILL, Acting Commissioner
of Social Security,

                Defendant.

Plaintiff Lisa K. Pazour seeks judicial review of a final decision of defendant Nancy A. Berryhill, the Acting Commissioner of Social Security, under 42 U.S.C. § 405(g), which denied her application for disability benefits. In finding Pazour capable of working eight hours per day in a sedentary position, the ALJ placed no weight on the opinions of Pazour's treating physician and an examining medical consultant, both of whom concluded that her chronic pain prevented her from working eight hours per day. Because the ALJ failed to weigh properly the opinions of these two physicians -- and relatedly, failed to offer valid reasons for discounting Pazour's credibility -- the Commissioner's decision will be reversed and remanded. The court also will order the Commissioner to calculate and award benefits upon remand.

BACKGROUND[1]

A. **Overview of Claimant**

Pazour was born on April 20, 1962. She applied for SSDI in 2012, alleging a

---

[1] The administrative record ("AR") is available at dkt. #5.

disability onset date of December 6, 2009. Pazour was 47 years-old at the date of the alleged onset of her disability; she was 50 years-old when she applied for disability; and she was 52 years-old at the time of her hearing in May 2014. As the ALJ notes, over this period, Pazour moved from younger individual, ages 45-49, to the age category of closely approaching advanced age, ages 50-54 *See* 20 C.F.R. § 404.1563. Pazour has at least a high school education, is able to communicate in English, and has past work experience as an assembly stock supervisor. She last worked in 2009, except for limited part-time secretarial and clerk jobs held more recently. Before her alleged onset date, Pazour worked for 20 consecutive years. She claims disability based on chronic pain, specifically in her back and legs.

B. Medical Record

1. Pre-Alleged Onset Date

Pazour had lower back surgery, consisting of microdiskectomies at the L5-S1 level in 2002 and 2004. In 2006 and 2007, Pazour began complaining of some foot numbness or paresthesia to her surgeon, Dr. Abernathy, and her podiatrist, Dr. Maurus. Both recommended that she manage these symptoms conservatively and perhaps try orthotics. (AR 307, 314.) By late 2007, from the record, Pazour appears to have suffered a set-back with increased back pain, radiating down her right leg to her foot. This time, Dr. Maurus ordered an MRI of her lumbar spine, which was conducted on January 3, 2008, revealing "[a] mild to moderate degree of postoperative epidural scarring . . . in the right lateral epidural space at the L5-S1 level, [but] no recurrent disc extrusion or other new diagnostic abnormality." (AR 309.)

In the next several months, Pazour saw a number of doctors seeking relief from chronic pain, while working reduced hours or completely off work. A January 16, 2008, medical note by Balaji Singaracharlu, M.D., indicates that he saw Pazour at the request of Dr. Maurus for further evaluation of right distal lower extremity pain, tingling and numbness and foot contractures. On examination, Singaracharlu noted "[p]atient has pain with palpation diffusely over the anterior shaft of the tibia, dorsum of the foot, as well as the medial arch of the foot." (AR 302.) While the examination had to be cut short because of Pazour's "extreme distress and behavior," Pazour "appeared to have some motor weakness with knee extension." (AR 302-03.) The doctor also noted that other areas revealed no tenderness and that she had "normal range of motion of the hip and knees." (*Id.*) A few days later, Dr. Singaracharlu administered a transforaminal epidural steroid injection. (AR 308.)

On February 18, 2008, Pazour saw Jeffrey Jones, M.D., for a second opinion about surgery, having already seen Dr. Abernathey, who determined that she was not a surgical candidate. Dr. Jones noted some pain and weakness during the physical examination, but similarly concluded that she was not a surgical candidate, suggesting that she work on pain management through a simulator procedure, further epidurals or facial blocks. (AR 532.)

On March 10, 2008, Pazour saw another surgeon Dr. Douglas T. Sedlacek, who noted that she had been off work since December, having experienced an episode of acute right radicular pain in October that had not improved. Pazour reported that the epidural steroid injection had not provided relief, so Dr. Sedlacek prescribed different medications,

3

Cymbalta and Gabapentin.  Sedlacek also suggested she try a lumbar epidural block, which he administered once a month in March, April and May.  (AR 327-29, 339, 341.)

Pazour saw Dr. Sedlacek again in June, and specifically requested that she be allowed to return to an 8-hour day.  (AR 361.)  Despite Sedlacek's note granting approval, Pazour continued to seek treatment for her chronic pain.  Also in June she underwent a RACZ procedure by Dr. Tork Harman, which did not significantly improve her pain.[2]  (AR 362-63.)  Later that fall, Pazour continued to see Dr. Sedlacek, along with another physician, Dr. Kline, discussing other treatment options.  At an appointment on November 8, 2008, Dr. Sedlacek changed her pain medications, suggesting that she should consider the dorsal column stimulator offered by Dr. Kline.  (AR 367-68; *see also* AR 386-87 (another appointment with Sedlacek to discuss pain management options).)

In February 2009, Pazour had the stimulator procedure with Dr. Kline.  (AR 392-96.)  Unfortunately, she reported that the procedure exacerbated her pain (AR 502.) During an appointment with Dr. Sedlacek on September 9, 2009, Pazour reported being "somewhat stable on her medications," but still complained of pain ranging from 3 to 9 on a 0 to 10 scale.  Dr. Sedlacek again changed her prescription medications.  (AR 503.)

In addition to recurring back pain radiating down her right leg, Pazour suffered from

---

[2] "Epidural lysis of adhesions (LOA), also known as percutaneous adhesiolysis or the Racz procedure, is a minimally invasive spine surgery which involves the dissolution of epidural scar tissue by mechanical means to facilitate the spread of analgesics in an effort to alleviate pain.  It is a type of percutaneous adhesiolysis procedure commonly used to treat chronic pain resulting from failed back surgery syndrome wherein scar tissue has formed around the nerves and causes pain. Evidence suggests the procedure may also be effective in treating spinal stenosis and radicular pain caused by a herniated disc." "Epidural lysis of adhesions," Wikipedia, https://en.wikipedia.org/wiki/Epidural_lysis_of_adhesions.

4

left knee pain. A May 2008 scan of her left knee revealed "degenerative changes in the medial knee joint compartment." (AR 352.) In December 2008, Dr. Daniel C. Fabiano operated on her left knee. (AR 373.) That surgical procedure proved unsuccessful as well, and Pazour has a complete knee replacement in April 2009. (AR 397, 413.) Pazour subsequently completed 19 sessions of physical therapy. (AR 449.) Follow-up appointments indicated that Pazour was healing well. (AR 556, 559.) Indeed, by October 15, 2009, Pazour reported "no pain at all," and that she "forgot [she] had surgery" (AR 560.)

### 2. Post-Alleged Onset Date

While this earlier medical record provides context for Pazour's complaints of pain, she claims an alleged disability onset date of December 2009. In a December 14, 2009, appointment with Dr. James R. Lamorgese, for low back and right leg pain with numbness and tingling, Pazour reported pain problems dating back to 2006 and her unsuccessful surgeries in 2002 and 2004 to relieve her pain. She further reported that: "standing, walking, handling, lifting exacerbates the pain. Rest helps to some extent, but does not really relieve it." (AR 572.) Lamorgese also notes that she rated her pain at a 3 to 8 on a 10-point scale. Lamorgese reviewed her treatment to date, and noted that Pazour's pain medication provided "minimal relief of pain." (AR 572.)

Still, in reviewing her acts of daily living, Dr. Lamorgese noted that her pain "reveals only mild to moderate interference." (AR 573.) Moreover, upon administering the Oswastry Low Back Pain Scale, Pazour scored a 26, which showed mild to moderate impairment. (AR 573.) Her physical examination also revealed normal low back anatomy,

with no atrophy, but left knee reflex was trace, and there was "marked decreased vibratory sensation at the big toe in both feet." (AR 573.)

Following that first appointment in December 2009, Dr. Lamorgese's initial impression was "chronic back and right leg pain with sensory changes secondary to the epidural scarring at the L5-S1 level." (AR 573.) He recommended continued conservative care, with medication (oxycodone, tramadol). He further scheduled to see her again in one month. Ultimately, Dr. Lamorgese would see Pazour roughly every four to six months until September 2012, when Pazour moved to Wisconsin and Lamorgese retired from medical practice.

Dr. Lamorgese's medical reports over this period of 2¾ years reveal consistent pain, with Pazour rating her pain as low as 1 or 2, but often up to 4 or 6, and notes that the pain was at an 8 or 9 at times. Throughout this period, Lamorgese adjusted pain medications, added muscle relaxants and anti-depressants, and monitored her conservative use of oxycodone, all in an attempt to relieve Pazour's pain and increase her ability to be active. (AR 579, 599-607, 639.) Pazour also underwent an MRI in 2012, which revealed some postoperative changes, including "perithecal and perineural enhancement present surrounding the thecal sac and exiting right nerve root," but "no convincing evidence or recurrent disk protrusion." (AR 599.)

In a letter dated September 4, 2012, Dr. Lamorgese reviewed Pazour's medical condition and limitations, noting that: (1) Pazour "continues to have severe pain in the back and right leg, which limits her activities significantly"; and (2) various procedures that she has tried over the years -- namely RACZ procedure and the stimulator -- have proved

unsuccessful in providing relief. (AR 609.) Lamorgese also indicated that the recent MRI revealed post-operative changes, but no evidence of recurrent herniated disc. Still, Pazour has some "mild weakness in the right foot with dorsiflexion," more limited reflex, and "decreased sensation in the forefoot on the right." (*Id.*) In light of these conditions, Lamorgese opined that Pazour

> [c]annot do any significant lifting or carrying. Maximum carrying weight would be 10 pounds on a very occasional basis. Prolonged standing, walking or sitting will cause greatly increased pain. Stooping, climbing, kneeling and crawling should never be done. The patient can sit, stand or lie down as needed on a frequent basis. She does need postural shifts in any 1 to 2 hour period for 10 to 15 minutes. I do not believe that this patient can be gainfully employed on an 8 hour basis.

(*Id.*)

After her move to Wisconsin, Pazour began seeing Melissa S. Eskridge Schaub, N.P. In a new patient evaluation note dated February 6, 2013, Schaub wrote that Pazour was being seen for ongoing pain complaints. (AR 670.) Schaub explained that Pazour "attempts to lead an active lifestyle, including being outdoors, camping, canoeing and spending time with families, though pain is worse in the summer given her attempts to be more functional," and that Pazour wants to "explore a more effective treatment plan and/or medication management to minimize symptom severity." (AR 670.) Pazour also reported that she is in pain constantly, with a current pain score of 6, at best a 3, and at worst a 9. She further reported that her pain is "made worse by prolonged standing, laying on stomach, exercise, prolonged sitting, bending forward, walking and laying on back," with laying on her side the best option for relief. However, Pazour did indicate that she can walk 1 to 2 blocks. Finally, Pazour's physical exam that day revealed: absent ankle reflex

on the right, absent patellar reflex on the left; "Babinski toes were downgoing," "[d]iminished strength on the right great toe"; "unable to maintain strength against resistance"; "diminished sensation in the right lower extremity along the right lateral thigh, calf, foot and webbing of great toe"; and reported low back pain during certain rotations. (AR 672.)

As for a treatment plan, Schaub added an anti-inflammatory to her medication mix, and she suggested Pazour try a sustained-release oxycodone option. Schaub also noted that Pazour "continues to lead a relatively active lifestyle despite her pain impairment" and that she was considering sustained-release oxycodone options. (AR 673-74.) Pazour then saw Schaub for three additional visits over the next year, during which she rated her pain as ranging from 3 to 8 or 9 with medication management. (AR 676-688.)

In addition to seeing treating physicians on a regular basis, Pazour underwent a consultative examination in September 2012 with John D. Kuhnlein, D.O., occupational and environmental medicine. (AR 628-33.) During that examination, Pazour rated her back and right leg pain from 4 to 10 on a scale of 1 to 10. "The pain is increased with laying supine, sitting for more than one hour, standing for more than a few minutes and with walking. The pain is improved with laying on her left side. She does not need help with a lot of her activities of daily living because of the pain." Still, Pazour reported problems with self-care and personal hygiene activities, such as urinating, bathing and dressing herself, which require the help of her husband. (AR 628.) Pazour similarly reported problems with standing, sitting for too long, walking, climbing stairs, lifting, pushing and pulling, and travel due to pain from sitting too long.

Kuhnlein's physical examination of Pazour further revealed: "an obese female who is in acute pain during the examination. She is very stiff and very slow to move throughout the exam." (AR 630.) "She moved around the room with a slow tentative gait. She was unable to heal or toe walk and was unable to squat. She had a lot of difficulty getting on and off the examination table and requires assistance to move from sitting to supine and supine to sitting position." (*Id*.)

In light of his review of Pazour's medical records, interview, and physical examination, Kuhnlein limited Pazour to lifting, pushing, pulling or carrying 10-20 pounds rarely, rarely sitting, standing, walking or climbing stairs, and never stooping, bending, crawling, kneeling, climbing ladders, or dealing with uneven surfaces, and no traveling. (AR 632.)

### 3. Reviewing Doctors' Assessments

Matthew Byrnes, D.O., completed a physical residual functional capacity assessment, dated August 25, 2010, based on a review of Pazour's medical record. (AR 586-93.) Byrnes limited her to occasionally lifting and/or carrying up to 20 pounds, and 10 pounds frequently, concluded that she could stand and/or walk, six hours in an eight-hour workday, and also could sit six hours in an eight-hour workday. Byrnes determined that she had unlimited ability in pushing and/or pulling, but prohibited her from climbing ladders, rope and scaffolds, kneeling and crawling, and limited her to occasionally climbing ramp/stairs, balancing, stooping and crouching.

Two state agency doctors completed reviews of Pazour's records. (AR 94-97, 104-08.) Both limited Pazour to light exertional work. In so finding, the doctors interpreted

the 2012 MRI's as revealing "no nerve involvement." Despite this finding being limited to showing no recurrent herniated disc, the doctors discounted Dr. Lamorgese's opinion because he had not conducted a recent examination, despite having seen Pazour four months before his September 2012 letter.

### C. ALJ Opinion

The ALJ held a video hearing on May 7, 2014. The ALJ found that Pazour met the insured status requirements through June 30, 2015, and had not engaged in substantial gainful activity on or after December 6, 2009, the alleged onset date. The ALJ also found that Pazour suffered from the following severe impairments: degenerative disc disease with residual of two surgeries; obesity; and left knee degenerative joint disease with replacement in 2008. (AR 22.) In so finding, the ALJ determined that Panzour's depression was not a severe impairment, a finding that she does not challenge on appeal.

As for her residual functional capacity, the ALJ found that she could perform sedentary work as defined in 20 C.F.R. § 404.1567(a), except that she could only occasionally stoop, crouch, kneel and crawl. (AR 22.) The ALJ also restricted her from: using ladders, ropes and scaffolds; having exposure to extreme cold; and avoiding unprotected heights or dangerous moving machinery. In crafting her RFC, the ALJ significantly discounted Pazour's assessment of her functional abilities, finding that she "provided exaggerated and unlikely testimony regarding her limits." (AR 24.)

The ALJ also gave *no* weight to the opinion of her treating physician. In particular, the ALJ appears to discount Dr. Lamorgese's September 4, 2012, assessment based on his initial January 2010 note, in which he anticipated that the claimant would return to work.

10

(Ex. 17F at p.20.) The ALJ also discounted Dr. Lamorgese's 2012 assessment because: (1) it is "not supported by signs and findings with the degree of limitation indicated, as explained by the state agency medical consultant doctor in his analysis on page 9 of Exhibit 4A"; and (2) it relies "on complete acceptance of the claimant's allegations concerning the existence, persistence and intensity of symptoms and functional limitations, which the record as a whole and inconsistencies establish are not entitled to full credibility and are an underrepresentation of function." (AR 26.)

The ALJ further concluded that Dr. Lamorgese's 2012 assessment is "inconsistent with other evidence and inconsistencies in the record as a whole, which the treating doctor did not have available." (*Id.*) In apparent support of this vague, broad statement, the ALJ pointed to one particular treatment note from Pazour's lengthy record, a note dated September 28, 2012, that: there were no changes in motor or sensory function; straight leg raising test was unremarkable; she admitted using her medication sparingly; she rated her pain as between a 4 and a 6; and there was no evidence of recurrent disc herniation.

The ALJ also discounted the opinion of the consultative examiner, Dr. Kuhnlein, which was completed on October 25, 2012, and concluded that Pazour was greatly functionally limited. The ALJ gave "little weight" to this opinion because: "[t]he claimant's functions is not representative of her functioning elsewhere during the time in question;" (2) the opinion relies on complete acceptance of the claimant's self-reporting; and (3) the opinion is "inconsistent with the other available evidence and inconsistencies in the record as a whole which the doctor did not have available." (AR 26.) The ALJ further explained that Pazour reported to Dr. Kuhnlein that her pain ranged from a level

11

4 to 10, but "treatment notes with her treating surgeon do not show persistent allegations of pain to level 10." (*Id.*) Finally, the ALJ relied on the fact that Panzour did not have "emergency room visits or hospitalization for alleged extreme pain or observations of extreme pain." (*Id.*)

OPINION

In challenging the Commissioner's denial of his application for social security disability benefits, Pazour focuses on: (1) the ALJ's giving no weight to the September 2012 opinion of her treating physician, Dr. James Lamorgese; and (2) the ALJ's substantially discounting the October 2012 report of the examining physician, Dr. John D. Kuhnlein. The court addresses each in turn.

I. Treating Physician

An ALJ is required to assign a treating physician's opinion controlling weight, provided the opinion is supported by "medically acceptable clinical and laboratory diagnostic techniques[,]" and it is "not inconsistent" with substantial evidence in the record. *Schaff v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010); *see also* 20 C.F.R. § 404.1527(c)(2). When an ALJ does not give a treating source controlling weight, the ALJ must consider the type, length and nature of the relationship, frequency of examination, specialty, tests performed, and consistency and supportability of the opinion. *Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011); 20 C.F.R. § 404.1527(d)(2). An ALJ who rejects a treating source opinion must provide a sound explanation for doing so. *See Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011).

As described above, the ALJ placed *no* weight on Dr. Lamorgese's September 2012 opinion. In justifying his reliance instead on Dr. Lamorgese's initial note in January 2010 that Pazour would return to work, the ALJ ignored that *even at that time*, Lamorgese goes on to state that Panzour "is not going to seek employment probably until the fall of this year. She will go to a part-time job somewhere." (AR 667.) Moreover, that is exactly what happened with Pazour, who worked for a short period of time in a *very* part-time capacity as the secretary for a neighbor. (AR 49.)

The ALJ also justified rejecting Dr. Lamorgese's opinion because the state agency doctor did not find the same limitations, but that wholly undermines the deference due physician opinions over non-treating doctors absent some articulable, concrete basis. If the mere fact that a state agency reviewing doctor reached a different conclusion than that offered by a treating physician were sufficient, an ALJ could *always* discount the opinion of a treating physician. Finally, the ALJ stated that Dr. Lamorgese's opinion was unreliable because it was based on a "complete acceptance" of Pazour's self-reports is undermined by the record as well. There are multiple problems with this characterization, not least of which that it fails to recognize both a treating physician's ability (indeed, responsibility) to suss out malingers. Moreover, Lamorgese conducted multiple physical examinations, and the objective evidence in the record, including the 2008 and 2012 MRIs showing post-operative changes, including epidural scarring, help explain the pain and numbness Pazour was experiencing.

**II. Consulting Physician**

The ALJ's treatment of Dr. Kuhnlein's opinion is also inadequate. Unlike a treating

13

physician, the opinion of a consultative examiner is not entitled to controlling weight, but more weight is generally to be given the opinion of a medical source who examines a claimant than to the opinion of a non-examining source under 20 C.F.R. § 404.1527(c)(1) and § 416.927(c)(1). *See Simila v. Astrue*, 573 F.3d 503, 514 (7th Cir. 2009) (although ALJ not required to assign controlling weight to nontreating source, must evaluate according to certain factors). Specifically, the ALJ must weigh the opinion of a consulting doctor in light of the regulatory factors, including: whether the physician has actually examined the patient; whether the physician supports his opinion with medical signs and laboratory findings; how consistent the physician's opinion is with the evidence as a whole; and whether the physician is a specialist in the allegedly disabling condition. *See id.* at 514 (citations omitted); 20 C.F.R. §§ 404.1527(c)(3)-(6), 416.927(c)(3)-(6) (listing factors to consider in weighing medical opinions). The ALJ also must provide reasons for the weight he gives any medical opinion supported by substantial evidence in the record. Soc. Sec. Rul. 96–6p; 20 C.F.R. §§ 404.1527(e), 416.927(e); *Walters v. Astrue*, 444 F. App'x 913, 917 (7th Cir. 2011).

Here, too, the ALJ generally faults Kuhnlein for resting his opinion on purported "complete acceptance" of the claimant's reported condition, and finds his opinions inconsistent with other evidence in the record, but fails to acknowledge that Kuhnlein conducted his own physical examination of Pazour and reviewed the medical record, including objective findings concerning epidural scarring. As plaintiff points out in her reply brief, at a minimum, the ALJ critically failed to recognize that Drs. Lamorgese and Kuhnlein's opinions are consistent with each other, *and* that both required that Pazour be

14

allowed frequent movement between sit and stand positions and lying down.

In giving little and minimal weight to the opinions of Drs. Lamorgese and Kuhnlein, respectively, the ALJ erroneously relies primarily on his credibility assessment of Pazour herself, and even that assessment is flawed. While the ALJ provided a myriad of reasons for rejecting Pazour's reporting of the extent of her pain, and the limitations that pain poses to her full-time work, his reasons are thin at best. First, the ALJ selectively isolates portions of medical records, without recognizing their context or even the explanation Pazour provided during her testimony. For example, the ALJ relied on the fact that Pazour reported pain symptoms starting in 2007, but continued to work until December 2009. However, the ALJ failed to acknowledge that those same medical records revealed Pazour was working a reduced schedule (e.g., four hours per day) or not at all for much of that period, not to mention that Pazour saw no less than seven doctors during this period of time in a concerted (and ultimately unsuccessful) attempt to relieve her pain symptoms.

Second, the ALJ discounted Pazour's testimony about the numbness and curling of her toes on the basis that the medical record failed to support such a claim. To the contrary, the record is replete with examples of Pazour's complaints about pain throughout her feet, going back to 2007. (*See, e.g.*, AR 302, 305-06.) Even more persuasive, a number of doctors found decreased sensitivity and curling in her toes and feet on physical examination. (*See, e.g.*, AR 307 (noting "obvious curled under toes" and "decreased ability to dorsiflex her toes" from Nov. 15, 2007 note); AR 672 (noting "diminished strength in right great toe" and "webbing of great toe" in February 6, 2013 note).) And to the extent that the ALJ was interested in other objective evidence, the 2012 MRI provided support

15

for her reported symptoms.

Third, the ALJ relied on the fact that Pazour had "good results from surgery" without identifying which surgery, much less what significance it had as to Pazour's credited, ongoing back pain. Indeed, the record refers to only one "successful" surgery, on her left knee in 2008, but that surgery had *no* impact on her continued complaints of severe back and radiating leg pain.

Fourth, the ALJ cherry picked a number of isolated notes in the medical record and considered them out of context. For example, the ALJ noted that Pazour helped her son move in 2010 and that she rated her pain as a 1 at an appointment, which occurred sometime after that move. The ALJ, however, failed to note that Dr. Lamorgese went on to state in that same medical record that "[t]here was a period a week or 2 ago where she had severe pain after helping her son do some moving." (AR 666.) The ALJ also points to times in the medical record where she reported her pain was as low as a 2 or 3, but fails to acknowledge that she typically reported pain twice that, and that reports up to 8 or 9 (or even 10) offset the lower ones.

Fifth, the ALJ relied on the purported effectiveness of medication and her successful attempt at physical therapy. Here, too, the complete medical record bellies both conclusions. While Pazour tried various pain medications, some more successful than others, she repeatedly complained of break-through pain, coupled with her concerns about side-effects, including the risk of addiction, associated with these medications, in particular oxycodone. (*See* AR 56 (testifying that she tried to "trim down the meds because I don't

16

like the stuff. I want to be on as minimum as possible and still try to function.").[3] Instead, the ALJ fails to account for this at all. Moreover, the record reflects Pazour's attempts at other treatments: epidural injections, blocks, simulators, etc. Yet the ALJ fails to acknowledge that all proved unsuccessful and underscore the limited effectiveness of pain medication. Finally, as for her 2009 and 2010 physical therapy, those efforts proved successful for her left knee surgery, but did *not* address, much less resolve, her ongoing, severe back pain issues.

Sixth and finally, the ALJ purported to discount Pazour's credibility based on certain activities that she mentioned to her doctors, included on forms or testified to at the hearing. For example, in an appointment with Dr. Lamorgese, Pazour mentioned that she and her husband were "building a home" in Wisconsin. While she reportedly attempted to do some of the work, Pazour also told Dr. Lamorgese that her attempt caused her pain to "flare-up." (AR 607.) Moreover, the ALF ignored her hearing testimony, which was consistent with her comment to Lamorgese, that they were using a contractor to build their home. (AR 56.) In further questioning of credibility, the ALJ pointed out that Pazour testified she could only handle short car rides due to pain, but then testified that she traveled between Cedar Rapids, Iowa and Ojibwa, Wisconsin, a six and a half hour drive on a few occasions. Again, however, the ALJ fails to discuss Pazour's additional testimony that she purchased a truck so that she could recline during longer car rides, and because of

---

[3] The ALJ makes much of the fact that Pazour apparently forgot her medications on a trip in 2010. Here, too, he fails to note that Pazour reported to her doctor that she "managed," but "could have used some oxycodone." (AR 664.)

17

difficulty getting out of a car -- it being too low to the ground. The ALJ last relied on the fact that Pazour reported going fishing, but here, too, failed to acknowledge Pazour's description of fishing: her husband driving her to a park and putting a chair out for her. (AR 59.)

Credibility determinations are entitled to special deference because the ALJ has the opportunity to observe the claimant testifying, while a reviewing court obviously does not. *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010). Nonetheless, the court will overturn an ALJ's credibility finding if "patently wrong." *Carradine v. Barnhart*, 360 F.3d 751, 753 (7th Cir. 2004). For reasons just explained, such is plainly the case here, but at the very least, the ALJ's dubious assessment of Pazour's credibility does not serve as a sound basis for discounting the opinions of her examining physician, much less her treating physician.

In light of the court's review of the record, the court further determines that "all factual issues have been resolved and the record supports a finding of disability." *Israel v. Colvin*, 840 F.3d 432, 442 (7th Cir. 2016) (quoting *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 356 (7th Cir. 2005)). For the reasons explained above, the ALJ's reasons for not placing weight on Drs. Lamorgese and Kuhnlein's opinions were based on a deeply flawed credibility determination and wholly unjustified rejection of the opinions of her treating physician. Accordingly, the court sees no reason to remand this case for further factual review. Instead, the court will remand and direct the Commissioner to calculate and award benefits. *See Allord v. Astrue*, 631 F.3d 411, 415 (7th Cir. 2011) ("Courts have the statutory power to affirm, reverse, or modify the Social Security Administration's decision, with or without remanding the case for further proceedings. 42 U.S.C. § 405(g). This power

includes the courts' ability to remand with instructions for the Commissioner to calculate and award benefits to the applicant.").

ORDER

Accordingly, IT IS ORDERED that the decision of defendant Nancy A. Berryhill, Acting Commissioner of Social Security, denying claimant Lisa K. Pazour's application for disability and disability insurance benefits is REVERSED AND REMANDED. Upon remand, the Commissioner is directed to calculate and award benefits.

Entered this 20th day of February, 2019.

BY THE COURT:

/s/
_____
WILLIAM M. CONLEY
District Judge